UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**HEATHER LEWIS,**

     **Plaintiff,**

**vs.**                                    **Case No.: 8:12-cv-01005-T-27AEP**

**AARON'S SALES & LEASE
OWNERSHIP, INC.,**

     **Defendant.**

_____/

## ORDER

    **BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 15), to which

Plaintiff has responded in opposition (Dkt. 20). Upon consideration, the motion (Dkt. 15) is

GRANTED.

### FACTUAL BACKGROUND

    Aaron's hired Heather Lewis in August 2010 as a customer service representative ("CSR")

at Store C1099 in Hudson, Florida. Dkt. 21 at 43:13–20. Lewis was supervised by Timothy Frizzell,

the General Manager of Store C1099, and Neal Weldon, the Regional Manager overseeing fifteen

area stores. *Id.* at 46:5–6, 62:18–20; Dkt. 22 at 4:19–25.[1] As the only CSR in the store, Lewis was

responsible for, among other tasks, acquiring and maintaining customers, processing customer

payments, inputting customer information for new lease agreements, and assisting customers on the

showroom floor. *See* Dkt. 15-3 at 1[2]; Dkt. 21 at 46:20–23, 49:1–52:8.

---

[1] Citations to deposition transcripts reference the page and line numbers of the deposition transcript, not the page numbers automatically generated by CM/ECF.

[2] Page numbers cited in reference to exhibits refer to the numbering generated by CM/ECF, rather than the numbering on the original exhibits.

The CSR is considered part of a store's sales team. Dkt. 21 at 52:9–16. Sales staff at Aaron's are given specific sales goals for each day, week, and month, which vary depending on the employee's position. *Id.* at 56:8–14. It is undisputed that Lewis did not meet her sales goals while working at Store C1099. In her first performance review, Lewis was informed that she needed to improve her sales numbers because she "[c]onsistently falls short of performance standard[s]." *See* Dkt. 15-3 at 34. Her sales numbers in October, November, and December reflect a shortfall, and her weekly sales performance in January prior to her termination was also deficient. *See* Dkt. 21 at 87:9-13, 93:22-94:16, 98:1-99:10; Dkt. 15-3 at 40.[3]

While Aaron's contends that its corporate officers calculate sales goals based on the number of active lease agreements for the store (*see* Dkt. 15 at 5), Weldon's testimony reveals that Store C1099's sales goals were set before the store opened and have never changed or been reevaluated. Dkt. 22 at 16:20–17:14. Nor was Lewis the only employee with a poor sales record. Other employees at Store C1099 consistently failed to meet their sales goals, as did the store as a whole. Dkt. 23 at 18:7-18, 23:16-20; Dkt. 22 at 15-16 (exhibits 1 and 3 to Weldon's deposition).

Sales at Aaron's are handled through a process known as the "Flow." Dkt. 21 at 56:21–25. One element of the Flow is processing lease order forms. *Id.* at 57:1–4; *see* Dkt. 15-3 at 3. At Store C1099, Lewis was primarily responsible for this task. *See* Dkt. 15-3 at 3; Dkt. 21 at 57:5–58:24. The employee processing a lease order form is required to obtain employment and income information from the customer, as well as at least five references. Dkt. 21 at 60:14–61:3; *see* Dkt. 15-3 at 3. Also as a part of the Flow, CSRs and Sales Managers are primarily responsible for greeting customers as they enter the store. Dkt. 21 at 62:21–63:1. When greeting a new customer on the showroom floor,

---

[3]The exhibits to Lewis' deposition reflecting her sales goals are illegible. Aaron's argument as to her sales numbers are, however, confirmed by Lewis' testimony.

employees are required to take a clipboard with certain items and greet the customer with a handshake. *Id.* at 63:2–8, 64:23–25; Dkt. 15-3 at 5–6.

Aaron's contends that Lewis consistently failed to comply with the Flow. Lewis agrees that there were times when she did not obtain the necessary references or income information from clients (Dkt. 21 at 61:4–6), but she testified that Frizzell regularly tolerated this oversight. *Id.* at 62:4–5. Lewis also acknowledges that she violated the Flow by refusing to shake customers' hands when they entered the store because they were "dirty," and on "many" occasions failed to take a clipboard with her. *Id.* at 65:1-4, 67:14-18, 68:1–7, 100:20–101:1; Dkt. 22 at 49:6–11.

When she was hired, Lewis was given the Aaron's Policy Manual. Dkt. 21 at 80:1-5; *see* Dkt. 15-3 at 9. An electronic version was sent to her in an e-mail, and a hard copy was presented to her in a binder with other materials. Dkt. 21 at 75:18-25, 80:1-5. Contained within the Policy Manual is a section titled "Non-Discrimination and Sexual Harassment Policy." Dkt. 15-3 at 9. In this section is the following sentence, bolded and underlined: "If you feel you have been discriminated against, unlawfully/sexually harassed, or denied advancement for which you are qualified, you must call the Employee Relations Hotline in the Atlanta Home Office toll free at [*phone number*] to report any such situation." *Id.* at 12.

Lewis vacillated when asked whether she reviewed the non-discrimination and sexual harassment policy containing the phone number, testifying twice that she reviewed the policy (Dkt. 21 at 76:8-10, 80:24-81:1), and once that she did not "know if [she] received a copy or not because [she] didn't have them with all [her] pay stubs." *Id.* at 76:18-19. Nonetheless, Lewis signed a Policy Manual Acknowledgement [*sic*] form, in which she "acknowledge[s] that [she has] read and understand[s] the following policies contained in the Company's Policy Manual," including the

3

nondiscrimination and harassment policy (Dkt. 15-3 at 8). Further, she testified that her signature suggests that she received a copy of the policy manual and harassment policy. *See* Dkt. 21 at 76:20-25. Lewis testified, however, that she would have signed the acknowledgment *even if* she had not received the manual. *Id.* at 77:1-5. Despite her inconsistent testimony, it is undisputed that Lewis (1) received the Policy Manual,[4] and (2) signed the Policy Manual Acknowledgement [*sic*] stating that she read and understood the Non-Discrimination and Sexual Harassment Policy.

Twelve days after she was hired, Lewis learned that she was pregnant. *Id.* at 114:23–115:2. She informed Frizzell of her pregnancy two days later. *Id.* at 115:22–116:17, 124:18–126:7. Lewis testified that beginning in October or November of 2010, Frizzell repeatedly called her a "fat ass" after she "started showing." *Id.* at 118:11–119:19. According to Lewis, this occurred "just about" every day at lunch. *Id.* at 119:10–22. A co-worker of Lewis at Store C1099, Chris Wiley, testified that Frizzell once called Lewis a "fat cow" at a staff meeting in front of other employees. Dkt. 24 at 9:17–10:20, 12:10–13:5. Lewis also alleges that Frizzell directed "mooing" noises at her on three or four occasions during staff meetings. Dkt. 21 at 122:7-12.

In December 2010, Lewis gave Frizzell a doctor's note stating that her work should be subject to two accommodations: (1) she should sit for 15 minutes every hour, and (2) she should eat several small meals each day. There is no dispute that Aaron's provided Lewis with these accommodations. *Id.* at 136:2–15, 137:13–22. Notwithstanding, Lewis did not follow her doctor's order to eat several small meals a day because "she did not want to be called a fat ass or have a

---

[4]In her response, Lewis argues that "she could not recall whether she had received a copy of the anti-harassment policy at" the time she was hired. Dkt. 20 at 2. This characterization fails to account for Lewis' testimony that she was e-mailed the policy and received it in a binder, and that her signature on the acknowledgment suggests that she received a copy of the policy.

mooing sound made at me." *Id.* at 136:11-12.[5]

When Lewis requested the accommodations, Frizzell communicated the request to Weldon. The parties disagree on Weldon's reaction to Lewis' request. Lewis testified that in January 2011, Weldon informed Lewis that her restrictions were "inconvenient" and asked "how long it was going to go on." *Id.* at 140:5-10. Weldon denies this (Dkt. 22 at 43:10-13), testifying that he requested more information about the accommodations because allowing Lewis to take a break while assisting a customer on the sales floor could "[p]otentially" be an inconvenience to the customer she was assisting. *Id.* at 39:3-40:6.

On January 17, 2011, Weldon was visiting Store C1099 and witnessed Lewis greet a customer without a clipboard and without shaking the customer's hand, contrary to the requirements of the Flow. Dkt. 21 at 67:23-25; Dkt. 22 at 33:6-8, 34:7-10. Weldon took Lewis aside to discuss the encounter. Dkt. 22 at 33:12-19. At the time, Weldon had no intention of terminating Lewis. *Id.* at 49:12-17, 52:5-13. During their discussion, Lewis admitted that she understood her responsibilities as a CSR (*id.* at 33:16-18), but told Weldon that no one in the store greeted customers with the clipboard and she would not shake customers' hands. Dkt. 21 at 67:21-68:7, 100:20-101:1; *see* Dkt. 22 at 49:6-11.[6] Weldon and Lewis disagree about exactly what Lewis said to Weldon after that. After Weldon reminded Lewis that shaking a customer's hand is mandatory (Dkt. 21 at 68:1-3), Lewis testified that she responded, "[I]f we had hand sanitizer, I would maybe reconsider, but I was not going to put myself or my unborn child in any sort of danger by shaking someone's hands that is

---

[5]Lewis contends that she was so afraid of being called derogatory terms that she would eat in the bathroom, but her testimony does not support that characterization. *See* Dkt. 20 at 4; Dkt. 21 at 145:14-17.

[6]Weldon testified that he had observed Lewis improperly greet customers on several prior occasions, but he did not recall any details of those encounters. *See* Dkt. 22 at 22:5-13, 23:6-10. Lewis admits, however, that she improperly greeted customers on "[m]any" occasions. Dkt. 21 at 65:1-4.

dirty." Dkt. 21 at 68:3-7. Weldon, on the other hand, testified that Lewis "refused to shake all customers' hands" because she believed Aaron's customers "are dirty." Dkt. 22 at 49:6-11. Weldon did not recall Lewis requesting hand sanitizer and testified that he "certainly would have accommodated hand sanitizer" because "many" of his stores have it. *Id.* at 49:18-20. Frizzell testified that Store C1099 "always" kept hand sanitizer available to its associates. Dkt. 23 at 22:8-16.

Weldon terminated Lewis after their interaction on January 17. Dkt. 22 at 21:12-19, 33:4-19, 49:6-16. When asked why Lewis was terminated, Weldon answered:

> For a few reasons. Consistently falling short of her sales goals, refusal to
> actively participate in our sales flow process and how we greet customers,
> not performing all of her job responsibilities, such as how she performed
> in the flow in putting customer reference information into our system.
> Those are the examples I can recall at this time.

Dkt. 22 at 21:13-20. He later reiterated that Lewis' failure to properly greet customers was not the only reason for her termination. *See* Dkt. 22 at 36:20-21. In fact, even though Weldon did not intend to terminate Lewis on January 17, he and Frizzell had previously discussed Lewis' poor sales performance in November and December, deciding that if it continued they "would need to look at replacing her." *Id.* at 30:12-14.

On the day of Lewis' termination, Weldon witnessed another sales associate, Ryan Yunk, greet a customer without a clipboard. *Id.* at 34:11-21. Weldon demoted Yunk from Sales Manager to CSR based on his failure to properly greet customers and his poor sales performance. *Id.* at 34:17-35:10; Dkt. 15-5 ¶ 6. While Lewis contends that other associates frequently failed to conform to the Flow, she acknowledges that the other sales associates would greet customers appropriately whenever Weldon was present. Dkt. 21 at 66:18-67:7.

### STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual

dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the

[non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir.

2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it

may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d

642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on

file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp.

v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the

motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citing *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991)). Once

the movant adequately supports its motion, the burden shifts to the nonmoving party to show that

specific facts exist that raise a genuine issue for trial. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d

812, 815 (11th Cir. 2010). The nonmoving party must "go beyond the pleadings," and designate

specific facts showing that there is a genuine dispute. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d

590, 593-94 (11th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). A mere scintilla of evidence in the

form of conclusory allegations, legal conclusions, or evidence that is merely colorable or not

significantly probative of a disputed fact cannot satisfy a party's burden. *Avirgan v. Hull*, 932 F.2d

1572, 1577 (11th Cir. 1991); *Kernel Records*, 694 F.3d at 1301.

The evidence presented must be viewed in the light most favorable to the nonmoving party.

*Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 658 (11th Cir. 2012). If there is a conflict

between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). "Although all justifiable inferences are to be drawn in favor of the nonmoving party," *Baldwin Cnty. v. Purcell*, 971 F.2d 1558, 1563-64 (11th Cir. 1992), "inferences based upon speculation are not reasonable." *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine dispute over a material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1998).

## DISCUSSION

### A.   Count I - Title VII Pregnancy Discrimination

#### 1.   Intentional Discrimination on the Basis of Pregnancy

Title VII prohibits discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k); *see Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999). Absent direct evidence of discrimination,[7] the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), typically applies in pregnancy discrimination cases involving circumstantial evidence. *See Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012); *Spivey*, 196 F.3d at 1312.

##### a.   *McDonnell Douglas Prima Facie* Case.

Under the *McDonnell Douglas* framework, the initial burden is on Lewis to establish a *prima facie* case of pregnancy discrimination by proving (1) she is a member of a protected class; (2) she was qualified to do the job; (3) she was subject to an adverse employment action; and (4) similarly situated employees outside of the protected class were treated differently. *Holland*, 677 F.3d at 1055.

---

[7]Lewis has not offered, and does not argue that there exists, direct evidence of discrimination.

To survive summary judgment, Lewis need only present sufficient evidence to allow a reasonable factfinder to determine that she has satisfied the elements of her *prima facie* case. *Johnson v. Sec., U.S. Dep't of Veterans Affairs*, 517 Fed. Appx. 933, 935 (11th Cir. 2013) (citing *McDonnell Douglas*, 411 U.S. at 802). Aaron's argues that Lewis cannot present sufficient evidence to establish that she was qualified for the job or that non-pregnant, similarly situated employees were treated differently.

> i.    *There are genuine disputes of material fact as to whether Lewis was qualified to do the job.*

To demonstrate that she was qualified for a position, a Title VII plaintiff must show that "she satisfied an employer's objective qualifications." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). However, where the qualifications are neither "objectively verifiable" nor "easily obtainable or within the plaintiff's possession," the plaintiff need not satisfy this portion of the *prima facie* case. *Kidd v. Mando Am. Corp.*, ___ F.3d ___, 2013 WL 5382138, at *5 (11th Cir. Sept. 27, 2013).

Aaron's argues that Lewis was not qualified for the CSR position because she consistently failed to meet her sales goals and failed to comply with the Flow. There remain, however, disputed issues of material fact concerning whether Lewis was qualified for her position. While Lewis indisputably did not meet her sales goals, there are questions about whether the goals were reasonable. The goals were set before Store C1099 opened, and they have never changed or been reevaluated by the Aaron's corporate office. *See Darboe v. Staples, Inc.*, 243 F. Supp. 2d 5, 13 (S.D.N.Y. 2003) (finding employee satisfied the "qualified" prong of his *prima facie* case in part because evidence raised a genuine dispute as to whether employee's sales goals were realistic). Moreover, almost all of the employees at Store C1099 consistently failed to meet their sales goals,

and the store in general did not meet its goals for six straight months around the time Lewis was employed. In addition, disputed issues arise as to whether Lewis was objectively unqualified based on her failure to obtain and enter references on leasing forms. Lewis admitted that she frequently did not enter a sufficient number of references, but she also testified that Frizzell frequently told her not to continue her search for additional references. Aaron's is therefore not entitled to summary judgment on the basis of whether Lewis was qualified for her position.

ii.    *Lewis does not present sufficient evidence to allow a factfinder to conclude a similarly situated employee outside of her protected class was treated more favorably.*

When a plaintiff alleges discriminatory discipline, she must show that the employer treated similarly situated employees who are not in the protected class more favorably. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). To establish that a comparator was similarly situated, the plaintiff must show that "the quantity and quality" of the comparator's misconduct was "nearly identical" to her own. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008).

Lewis points to Ryan Yunk as a comparator. It is undisputed, however, that the "quantity and quality" of his misconduct was not "nearly identical" to that of Lewis. Specifically, Lewis has produced no evidence suggesting that Yunk refused to comply with the Flow, only that he did not properly greet a customer on one occasion while Weldon was in the store.[8] Her refusal to shake future customers' hands is markedly different from Yunk's misconduct. Lewis has therefore failed to present evidence sufficient to allow a reasonable factfinder to conclude that she can prove a *prima facie* case of intentional discrimination.

---

[8] A plaintiff alleging pregnancy discrimination "need not identify specific non-pregnant individuals treated differently from her, if the employer violated its own policy in terminating her." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1321 (11th Cir. 2000). Lewis does not argue that Aaron's violated its own policy when she was terminated.

b. Aaron's Has Articulated Legitimate, Nondiscriminatory Reasons for its Action.

Even if Lewis presents sufficient evidence of a *prima facie* case to survive summary judgment, Aaron's is nonetheless entitled to summary judgment because it has presented a legitimate, nondiscriminatory reason for terminating Lewis, which Lewis has not sufficiently rebutted.

After Lewis establishes a *prima facie* case, Aaron's must "articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802; *see Holland*, 677 F.3d at 1055. Aaron's burden is one of production, not of persuasion. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "The employer need not persuade the [finder of fact] that it was actually motivated by the proffered reasons." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (quotations omitted). However, "the defendant must clearly set forth . . . the reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 255. As long as the employer articulates a "clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Id.* at 254-55.

Aaron's first contends that Lewis was terminated because she refused to greet customers in accordance with the Flow. *See* Dkt. 22 at 21:13-20, 49:12-17, 52:5-13. Second, Aaron's contends that Lewis was terminated because she failed to enter references appropriately on applications. *See id.* at 21:13-20. Third, Aaron's contends that it terminated Lewis for failing to meet established sales goals. *See id.* at 21:13-20, 36:20-24. All three reasons are legitimate and nondiscriminatory. *See Jarvis v. Siemens Med. Solutions USA, Inc.*, 460 Fed. Appx. 851, 857 (11th Cir. 2012) (recognizing insubordination as a legitimate, non-discriminatory reason for termination); *Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1035 (8th Cir. 2006) (terminating employee for refusing to comply with

11

a manager's request concerning company policy is a legitimate, nondiscriminatory reason); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (an employer's honest belief (even if erroneous) that an employee violated a work rule constitutes a legitimate, nondiscriminatory reason for firing an employee); *Beal v. Convergys Corp.*, 489 Fed. Appx. 421, 424 (11th Cir. 2012) (failing to meet sales goals and recording calls contrary to company policy are legitimate, nondiscriminatory resaons).

        c.     <u>Lewis Fails to Rebut Aaron's Legitimate, Nondiscriminatory Reason for Terminating Her.</u>

"Once the employer identifies a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination disappears, and the burden shifts back to the plaintiff 'to demonstrate that the proffered reason was not the true reason for the employment decision.'" *Holland*, 677 F.3d at 1055 (quoting *Burdine*, 450 U.S. at 256). The employee "cannot recast the reason but must meet it head on and rebut it." *Wilson*, 376 F.3d at 1088. Rebuttal evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519,1538 (11th Cir. 1997). And Lewis must present evidence allowing a factfinder to draw the inference that each of Aaron's articulated reasons is pretextual. *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc). If she fails to rebut even one reason, Aaron's is entitled to summary judgment. *Id.*; *see Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

In attempting to rebut Aaron's several reasons for her termination, Lewis argues that because

Weldon did not intend to terminate her prior to entering the store that day, his testimony that she was terminated not only for refusing to shake hands, but also for her sales performance and failure to enter references, creates an inconsistency sufficient to rebut Aaron's reason. She argues that if "there was no intention to terminate her prior" to her refusal to shake hands, "then the reason for her termination cannot be her performance."

This argument is flawed because the reason given by Aaron's for her termination was not solely "her performance." The termination was spurred by her refusal to shake customers' hands. Whether or not her performance was also a factor is irrelevant to the issue of pretext because it is undisputed that she was terminated, at least in part, due to her refusal to shake hands, a legitimate non-discriminatory job related reason. *See Tidwell v. Carter Prod.*, 135 F.3d 1422, 1428 (11th Cir. 1998) (The "existence of a possible additional nondiscriminatory basis for . . . termination does not prove pretext."). Rather than creating an inconsistency, Weldon's lack of intent to terminate Lewis before her refusal to shake hands lends credence to his testimony that he did not decide to terminate Lewis until after she refused to shake customers' hands.

Lewis next argues that Weldon's testimony evidences an inconsistent policy regarding the duty of sales associates to shake customers' hands, which is evidence of pretext. *See Williams v. City of Valdosta*, 689 F.2d 964, 975 (11th Cir. 1982) (evidence that employer's adherence to promotional policy was inconsistent supported conclusion that employer's use of policy was pretext). Weldon testified that he would not expect employees to shake hands with someone who was obviously ill, and employees may use discretion in determining whether to shake someone's hand in such circumstances. Dkt. 22 at 24:14-16. Contrary to Lewis' argument, there is no evidence that Aaron's had an inconsistent policy regarding shaking customers' hands or that Weldon applied it

13

inconsistently. It is undisputed that a proper greeting in accordance with the Flow was required by Aaron's. Dkt. 21 at 63:2-8, 64:23-25; Dkt. 22 at 22:5-13, 24:7-10; *see* Dkt. 15-3 at 5-6. Weldon's comments do not indicate the policy was applied inconsistently, only that there were permitted exceptions to the rule.

More importantly, Lewis' second argument is unpersuasive because it recasts the termination decision as one based on a single instance of improper greeting, rather than one based on her refusal to properly greet future customers. Lewis "believes that her termination was predicated solely on her refusal to shake the customer's hand," (Dkt. 20 at 16), but the undisputed evidence shows that this was not the case. When Weldon took Lewis aside after witnessing her improperly greet the customer, he informed her that the handshake was mandatory. Dkt. 21 at 68:3. Lewis refused to comply with this mandatory sales procedure, however, telling Weldon that she was not going to put herself or her unborn child in danger by shaking a customer's "dirty" hand. *Id.* at 68:3-7, 100:20-101:1; Dkt. 22 at 49:6-11. Moreover, Lewis told Weldon she "did not feel comfortable shaking certain people's hands" and she "was afraid of the dirty people that had come in and what [she] could get from that." Dkt. 21 at 100:21-101:1.

Viewing Lewis' testimony in the light most favorable to her, it is undisputed that she did not merely fail or refuse to shake the hand of a single customer on one occasion. Rather, she essentially refused to shake hands with future customers. *See* Dkt. 21 at 68:3-7, 100:20-101:1. *See also* Dkt. 22 at 49:6-11 ("She refused to shake all customers' hands in that meeting.").[9]

An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix*

---

[9] It is of no moment that Lewis testified that she would reconsider her stance on shaking hands if hand sanitizer was available because hand sanitizer was always available at Store C1099. *See* Dkt. 23 at 22:8-16.

*v. WLCY Radio/Rahall Commc'ns.*, 738 F.2d 1181, 1187 (11th Cir. 1984); *see Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001) (district courts do not "sit as a super-personnel department that reexamines an entity's business decisions"). Aaron's terminated Lewis because she would not shake hands with "dirty" customers, contrary to the Flow. No matter the merit or wisdom of that decision, Lewis cannot survive summary judgment because she has not met the reason head-on and rebutted it with such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions such that a reasonable fact-finder could find the reason unworthy of credence and therefore pretextual. Lewis' suspicion of discrimination is not enough. *See Rioux*, 520 F.3d at 1278 ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate that there is a genuine issue of material fact that the employer's proffered reason for [termination] was pretextual."). As a result, no reasonable factfinder could conclude that this reason was not what actually motivated Aaron's conduct. *See Combs*, 106 F.3d at 1538.[10]

Nevertheless, "even where a plaintiff fails to rebut all of the employer's proffered reasons for taking the adverse action, [s]he may still establish pretext by showing that a similarly situated coworker was treated more favorably." *Jarvis*, 460 Fed. Appx. at 857 (citing *Rioux*, 520 F.3d at 1279-80; *Rojas v. Florida*, 285 F.3d 1339, 1343-44 (11th Cir. 2002)). As discussed *supra*, however, Lewis cannot point to a comparator because the "quantity and quality" of Ryan Yunk's misconduct was not "nearly identical" to her own. *Rioux*, 520 F.3d at 1280.

Lewis has "failed to produce evidence sufficient to permit a reasonable juror to reject as spurious [Aaron's] explanation that it" fired Lewis because she refused to shake hands with customers, in violation of mandatory sales policy. *Combs*, 106 F.3d at 1543. Aaron's is therefore

---

[10]Because Lewis has failed to rebut at least one legitimate, non-discriminatory reason for her termination, the others need not be addressed. *See Crawford*, 482 F.3d at 1308.

entitled to summary judgment on Lewis' claim of Title VII pregnancy discrimination under the

*McDonnell Douglas* framework.[11]

### 2. *Hostile Work Environment*[12]

Title VII prohibits hostile work environments. "A hostile work environment claim under Title

VII is established upon proof that 'the workplace is permeated with discriminatory intimidation,

ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277

F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To

establish a hostile work environment claim, a plaintiff must show:

> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject
> to unwelcome harassment; (3) that the harassment must have been based on
> a protected characteristic of the employee . . .; (4) that the harassment was
> sufficiently severe or pervasive to alter the terms and conditions of
> employment and create a discriminatorily abusive working environment;
> and (5) that the employer is responsible for such environment under either
> a theory of vicarious or direct liability.

*Id.* Aaron's argues that Lewis cannot show that she was subject to harassment "sufficiently severe

---

[11]Lewis does not argue that she satisfies the alternative method of surviving summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011), which applies the "direct" method of proving discriminatory intent through circumstantial evidence). *See also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012) ("Another way [to survive summary judgment] is present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.").

[12]Lewis does not plead a hostile work environment claim, and on that basis alone summary judgment is appropriate. *See Marlborough Holdings Group, Ltd. v. Azimut-Benetti, SpA, Platinum Yacht Collection No. Two, Inc.*, 505 Fed. Appx. 899, 907 (11th Cir. 2013) (affirming district court's grant of summary judgment on civil conspiracy claims not separately pled); *Thampi v. Manatee Cnty. Bd. of Comm'rs*, 384 Fed. Appx. 983, 988 (11th Cir. 2010) (affirming grant of summary judgment where plaintiff did not amend his complaint to include a retaliation claim). *See also Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1247 (11th Cir. 2007) ("Because such a claim was not pled by Optimum, the district court was not required to address such a claim in ruling on HCA's summary judgment motion."). Nevertheless, because Aaron's moves for summary judgment on the claim and appears to believe that it is pled, the substantive arguments are addressed. *Cf. Edwards v. Fulton Cnty., Ga.*, 509 Fed. Appx. 882, 887 (11th Cir. 2013) ("We have recognized, however, that a defendant does not waive an affirmative defense if the earlier omission from responsive pleadings does not prejudice the plaintiff.").

or pervasive" to sustain her claim.

a.   There Are Disputed Issues of Genuine Fact as to Whether Frizzell's Conduct was "Sufficiently Severe or Pervasive."

The "sufficiently severe or pervasive" element of a hostile work environment claim includes an objective and subjective component. To be actionable, the alleged behavior "must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'" *Id.* at 1276 (quoting *Harris*, 510 U.S. at 21-22). In evaluating the objective severity of the harassment, four non-exclusive factors are usually considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)). No one factor is determinative, and they must be considered as a whole. The "totality of the circumstances" is the "touchstone" of a hostile work environment analysis. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007).

i.   *The frequency of the conduct.*

Isolated and sporadic incidents are not sufficiently frequent to render conduct severe and pervasive. There must be "repeated incidents of verbal harassment that continue despite the employee's objections." *Shanoff v. Ill. Dep't of Human Servs., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000). There is no "magic number" of insults indicative of a hostile work environment, however. *Miller*, 277 F.3d at 1276.

In *Johnson v. Booker T. Washington Broadcast Service, Inc.*, for example, "roughly fifteen separate instances of harassment over the course of four months" were sufficiently frequent to render conduct severe and pervasive. 234 F.3d 501, 509 (11th Cir. 2000). Likewise, in *Zisumbo*, the Tenth

17

Circuit held that when a supervisor calls a pregnant employee "prego" in approximately 75% of their interactions over a three-month period, the conduct is sufficiently severe and pervasive to survive summary judgment. *Zisumbo v. McCleodUSA Telecommc'ns Servs., Inc.*, 154 Fed. Appx. 715, 726 (10th Cir. 2005).

The frequency of Frizzell's conduct is in dispute. Lewis testified that Frizzell insulted her just about every day and "mooed" at her three or four times. Frizzell denies any such conduct. Chris Wiley testified that Frizzell called Lewis a "fat cow" once at a staff meeting. Taking the testimony in the light most favorable to Lewis, she was called a derogatory name nearly every day. If fifteen instances of harassment over four months and harassment in 75% of interactions with a supervisor constitute conduct sufficiently frequent to survive summary judgment, then the near-daily verbal harassment endured by Lewis could also constitute conduct sufficiently frequent to create a hostile work environment.

  ii. *The severity of the conduct.*

Frequency cannot be considered in isolation, however. The severity of the conduct must also be addressed. "Title VII is only implicated in the case of a workplace that is permeated with discriminatory intimidation, ridicule and insult." *Miller*, 277 F.3d at 1275. The mere utterance of an epithet will not suffice. *Harris*, 510 U.S. at 21. When epithets are used, a hostile work environment persists only if they are "so 'commonplace, overt and denigrating that they created an atmosphere charged with . . . hostility.'" *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)). *See also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1303-04 (11th Cir. 2012) (plaintiff survives summary judgment because seven racist acts over a year, combined with a possibly threatening confrontation,

created a racially charged work environment).

The proposition that epithets, without more, will not suffice is reinforced in *MackMuhammad v. Cagle's Inc.*, 379 Fed. Appx. 801, 805-06 (11th Cir. 2010). There, co-workers called the plaintiff "Bin Laden" and "muhammad-man" and made comments and jokes regarding his religious-based refusal to eat pork. *Id.* at 805. There was no indication on the record, however, that the comments were "intimidating or threatening in any way," and the plaintiff never claimed to feel threatened. *Id.* The lack of intimidation was bolstered by the undisputed facts that the plaintiff never submitted a complaint and his work was not affected by the comments. While the comments were "rude, insulting, and insensitive," they fell "more in the category of epithets or boorish behavior, which are not actionable under Title VII." *Id.* at 805.

When viewed in the light most favorable to Lewis, the facts in this case are similar to those in *MackMuhammad*. Although Frizzell's behavior was "rude, insulting, and insensitive," his comments are more indicative of boorish behavior than of creating an atmosphere charged with hostility. And there is no indication on the record that Frizzell's comments were "intimidating or threatening in any way." Moreover, the lack of intimidation is bolstered by the undisputed fact that Lewis never filed a complaint. Nevertheless, the daily nature of the comments endured by Lewis distinguishes this case from *MackMuhammad* and creates a more pervasive environment of harassment than if the insults had been isolated or sporadic.

> iii.    *Whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance.*

Both of the final two factors implicate disputed issues of fact. A genuine dispute exists as to whether Frizzell's comments were objectively "humiliating." In *Miller*, the nature of the utterances,

coupled with the fact that they were directed at the employee and sometimes used in front of others, established that the conduct was objectively humiliating. *Miller*, 277 F.3d at 1276. Here, other than the one instance described by Chris Wiley, questions remain as to whether the insults were used in front of others, and if so, how often they were used. The weight of the fourth factor is also contingent on a disputed issue of fact. Lewis' testimony of leaving staff meetings because of Frizzell's conduct (Dkt. 21 at 122:24-25) establishes a fact issue as to whether the harassment produced tangible effects on her job performance.

      iv.     *Totality of the circumstances.*

     Taking the evidence in the light most favorable to Lewis and considering all four factors, a genuine dispute of material fact exists as to whether Frizzell's conduct was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Miller*, 277 F.3d at 1275. While frequent, there is a genuine dispute as to whether the conduct was so severe as to create a work environment charged with hostility, and a reasonable factfinder could conclude that Frizzell's conduct was rude, boorish behavior, as opposed to severe, denigrating treatment of an employee. This conclusion is consistent with that of other courts, which have noted that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is a quintessential question of fact. *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006); *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997); *see Shockley v. HealthSouth Ga. Rehab. Hosp.*, 923 Fed. Appx. 742, 747 (11th Cir. 2008) (finding a disputed question of fact as to severity and pervasiveness where plaintiff alleged frequent, severe, threatening, and humiliating verbal harassment).

b.      Aaron's Is Entitled to Summary Judgment on its *Faragher* Defense.

Even if Lewis survives summary judgment on her *prima facie* hostile work environment claim, Aaron's contends that it is entitled to summary judgment on its *Faragher* defense. Under *Faragher v. City of Boca Raton*, an employer may raise an affirmative defense to a hostile work environment claim created by a supervisor if (1) the employer exercised reasonable care to prevent and promptly correct harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm. 524 U.S. 775, 807 (1998). Aaron's bears the burden of establishing both elements.

When an employer promulgates and effectively disseminates complaint procedures as a part of its harassment policies, it has satisfied the first prong of the *Faragher* defense. *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298 (11th Cir. 2000). The mere existence of a policy does not automatically satisfy an employer's burden, however. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001). To demonstrate that the policy was effectively disseminated, the defendant is "required to show that its . . . policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect." *Id.*

In *Walton v. Johnson & Johnson Services, Inc.*, the employee argued that she never received the harassment policy, having testified that "if [the employer] mails something out, they probably mail it out with a bunch of other stuff, easily to be thrown away. Who knows? Who knows if I even got it." 347 F.3d 1272, 1287 n.13 (11th Cir. 2003). Rejecting the testimony as irrelevant to the inquiry of whether the employer adequately disseminated the harassment policy, the court held that "[t]he fact that neither Walton nor another employee remember receiving the policy (as opposed to being able to definitely testify that they never received it) is not particularly probative of whether

21

Walton did in fact receive a copy of the policy." *Id.*

Lewis argues that the *Faragher* defense does not apply because she never received the policy and was not aware of the harassment hotline. This argument is contradicted by her testimony. Lewis testified that she received a copy of the policy twice and signed a form acknowledging she reviewed the policy. Dkt. 21 at 75:18-25, 80:1-5; Dkt. 15-3 at 9. Lewis' testimony that she would have signed the acknowledgment form even if she had not read the policy is "not particularly probative" of whether she did in fact receive a copy. *Walton*, 347 F.3d at 1287 n.13. Likewise, her testimony that she did not "ever remember seeing [the policy] as of January" is not probative of whether Aaron's regularly disseminates the policy to its employees or whether Lewis received a copy in August when she was hired, considering her deposition testimony.

Just as the Eleventh Circuit concluded in *Walton*, Aaron's has demonstrated that it effectively disseminated the policy and there is no genuine dispute of material fact as to whether Lewis received a copy. *Accord Fuller v. Fiber Glass Sys., LP*, 618 F.3d 858, 862, 864 (8th Cir. 2010) (affirming district court's conclusion that employer met the first prong of the *Faragher* defense where employee acknowledged receiving the initial policy and signed a document indicating she received the updated policy, but later testified she never received it); *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999) (holding *Faragher* defense satisfied where employee signed acknowledgment form stating she understood it was her responsibility to read and understand the policy, but later complained she had no knowledge of the policy).

With the first prong of the *Faragher* defense satisfied, Aaron's is entitled to summary judgment if it can prove Lewis failed to take advantage of the opportunities presented in the nondiscrimination and harassment policy. *See Faragher*, 524 U.S. at 807. It is undisputed that Lewis

did not file a complaint or use the information in the policy to report Frizzell's harassment. The second prong is therefore satisfied. Aaron's is therefore entitled to judgment as a matter of law on based on its *Faragher* affirmative defense. *See id.* at 807-08 (A demonstration of a plaintiff's failure to use the complaint procedure provided by the employer "will normally suffice to satisfy the employer's burden under the second element of the defense."). *See generally White v. Creative Hairdressers Inc.*, 503 Fed. Appx. 938, 941 (11th Cir. 2013) (holding district court did not err in granting employer summary judgment on *Faragher* defense); *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1307 (11th Cir. 2007) ("[W]e conclude that Blue Cross has established both elements of the [*Faragher*] defense, and on that basis the district court's grant of summary judgment is due to be affirmed.").

**B.     Count II - FCRA Pregnancy Discrimination**

Count II of the Complaint is a claim for discrimination due to pregnancy brought under the Florida Civil Rights Act, §§ 760.01-760.11, *Florida Statutes*. This Court has held that the FCRA does not cover pregnancy discrimination. *See Zemetskus v. Eckerd Corp.*, Case No. 8:02-cv-1939-T-27TBM, Dkt. 13 (M.D. Fla. Apr. 2, 2003) (Whittemore, J.). The federal district courts and Florida's district courts of appeal are split on this question,[13] and neither the Florida Supreme Court nor the Eleventh Circuit has addressed the issue since *Zemetskus*.[14] Accordingly, there is no basis to recede

---

[13]*Glass v. Captain Katanna's, Inc.*, ___ F. Supp. 2d ___, No. 6:13-cv-421-Orl-19GJK, 2013 WL 3017010, at *2-5 (M.D. Fla. June 17, 2013) (explaining in detail the split among Florida's intermediate appellate courts). *Compare Glass*, 2013 WL 3017010, at *5 (holding the FCRA prohibits discrimination on the basis of pregnancy); *Wynn v. Fla. Automotive Servs., LLC*, No. 3:13-cv-133-J-32MCR, 2012 WL 4815688, at *2 (M.D. Fla. Oct. 10, 2012) (same), *with Boone v. Total Renal Labs., Inc.*, 565 F. Supp. 2d 1323, 1326-27 (M.D. Fla. 2008) (holding the FCRA does not create a cause of action for pregnancy discrimination); *Fernandez v. Copperleaf Golf Club Cmty. Ass'n, Inc.*, No. 2:05-cv-286-FTM-29SPC, 2005 WL 2277591, at *1 (M.D. Fla. Sep. 19, 2005) (same).

[14]The Florida Supreme Court recently has accepted discretionary jurisdiction over *Delva v. Continental Group, Inc.*, 96 So. 3d 956 (Fla. 3d DCA 2012), which squarely addressed "[t]he discrete, single issue [of] whether the Florida Civil Rights Act, section 760.10, Florida Statute, prohibits discrimination in employment on the basis of pregnancy." *Id.* at 957 (internal footnotes omitted).

from this Court's prior ruling. The FCRA does not cover Lewis' claim of pregnancy discrimination, and Aaron's is therefore entitled to judgment as a matter of law on Count II.

Accordingly,

1) Defendant's Motion for Summary Judgment (Dkt. 15) is **GRANTED**.

2) The Clerk is directed to **ENTER** final judgment in favor of Defendant Aaron's Sales & Lease Ownership, Inc. and to **CLOSE** the file.

**DONE AND ORDERED** this _22nd_ day of October, 2013.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record

24